IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BELINDA CHERRY, )<br>    Plaintiff, )<br>                            )<br>vs.                          )<br>                            )<br>INDEPENDENT LIVING CENTER OF )<br>MOBILE,                      )<br>    Defendant.               ) | CIVIL ACTION 1:23-00142-KD-B |

**ORDER**

This matter is before the Court on Defendant Independent Living Center of Mobile's Motion for Summary Judgment (Docs. 28, 29), Plaintiff Belinda Cherry's Response (Doc. 31), and Defendant's Reply (Doc. 34).[1]

**I.   Findings of Fact**[2]

This case is rooted in *pro se* Plaintiff Belinda Cherry (Cherry)'s former employment with Defendant Independent Living Center of Mobile (ILC) in Mobile, Alabama. On November 8, 2022, Cherry, who is Black, began working for ILC as its Human Resources Director, supervised

---

1 First, within Defendant's Reply is a motion to strike Plaintiff's Response as untimely (due 2/6/24 and filed 2/12/24). Though untimely, on 2/16/24 the Court – in its discretion -- allowed Plaintiff's Response and in turn provided additional time for Defendant to file its Reply. (Doc. 32). Thus, Defendant's motion to strike Plaintiff's Response as untimely is **MOOT**. Second, ILC moves to strike Plaintiff's Response, which is an unnotarized "affidavit" signed under penalty of perjury, as based solely on impermissible conclusory statements beyond her personal knowledge and unsubstantiated evidence. Considering Cherry's *pro se* status, rather than strike the Response, the Court construes her "affidavit" as simply her Response. Thus, ILC's motion to strike is **DENIED** in that regard. Third, as an extension of time was already given, Plaintiff's 2/21/24 motion for an extension to file her Response (Doc. 33) is **MOOT.**

2 The facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

by ILC's COO Thomas Whittington. (Doc. 29-1 at 7 (Dep. Cherry at 33); Doc. 29-1 at 42 (Decltn. Carter-Pugh (ILC Assistant Director)). As with all ILC employees, during her first 90-days Cherry was subject to a probationary period during which her work performance and professionalism were under heightened scrutiny while ILC determined if she was a good fit for the position. (Doc. 29-1 at 43 (Decltn. Carter-Pugh)).

Immediately after her hiring, both Whittington and ILC's CEO Peebles began receiving complaints from multiple staff members about how Cherry spoke to them. (Doc. 29-1 at 47, 50). Peebles also received complaints of the smell of marijuana on Cherry and in her vehicle. (Id. at 50). On December 23, 2022, Peebles told Whittington he was displeased with the professional quality of Cherry's work concerning an offer of employment letter she prepared and sent to an applicant, as it had misspelling, grammar, and punctuation errors. (Id.) That day, both Whittington and Peebles met with Cherry to demonstrate the kind of offer letter ILC wished to see, and requested the letter be rewritten and resent to an applicant. (Id.)

On January 5, 2023, Cherry was scheduled to conduct an interview of a prospective employee, with her Whittington and co-worker Breylen Carter-Pugh in attendance. (Doc. 29-1 at 43-44 (Decltn. Carter-Pugh); Doc. 29-1 at 47). During the interview, Cherry failed to follow ILC's interview protocols and procedures: she failed to make proper introductions, misspoke about the agency, and exhibited a lack of understanding as to how the interviewing process should proceed. (Id.) Whittington paused the interview with apologies, instructed Cherry on the correct procedure, and modeled ILC's procedure for her during the interview. (Id.) Per Whittington, Cherry became visibly agitated in front of the interviewee, and made a scene chastising him for interrupting her.

(Id.)  Whittington informed Peebles of the problematic interview and Peebles instructed him to draft an email to Cherry clarifying ILC's interview expectations. (Doc. 29-1 at 50).

On January 6, 2023, Whittington sent Cherry an email explaining: 1) why he interrupted her interview process (he felt uncomfortable with the facilitation and direction of the interview); 2) how she should have responded to his instruction; 3) how he preferred that she conduct interviews in the future to avoid confusion about expectations (providing written instructions); and 4) she was an important member of the ILC team and that he wanted to support her success at the company. (Doc. 29-1 at 56). Whittington copied ILC's CEO Peebles on the email so he was aware of the situation. (Id.) In response, Cherry sent Whittington an email stating as follows:

> I had no problem with you yesterday. I just ask in front of a potential Employee to please not interrupt me in my interview process. If you did not like the way I presented my interview, please pull me to the side or after the interview process let me know what I did wrong. It seems like when I come to you and address issues about how uncomfortable you make me feel it's a problem. I'm an individual who will voice my opinion with you when you are in the wrong. I know your my boss and I respect that and will never step on anyone shoes. But you are trying to make my job hard here because I disagree with how you treat me as your employee. I have notice since I disagree with you on your unprofessional behavior in front of staff members or potential employees calling me out in front of them should never happen, and I will never be at war with you. I have notice if it's not your way you want to be mean to me and other individuals with the company and I will not let you create a hostile work environment for me and the employees who work here I know my rights. It was very unprofessional how you handle me in that interview, and I just simply ask you to pull me to the side and you apologized now you send me this email why? I haven't done anything to you. You pulled me in your office showing me bad things about Dr. Peebles online and saying bad things about him and I'm in a bad place right now because, I stand up for right. You want to come after me but its ok, I want to have a meeting with you and Dr. Peebles when he gets back. I am afraid of you and your angrier problems you have and I don't feel comfortable talking to you alone. I didn't do anything wrong, I follow the chain of command, I do my job, I'm friendly to you, I respect you, and I think you're a great knowledgeable person that I can learn from, but you have to stop taking things so personal and change your attitude before you get us in a lot of trouble.

(Doc. 29-1 at 55). ILC viewed Cherry's email as insubordinate and unprofessional.

Later that same day, Cherry asked to meet with Peebles and so met with Whittington and Peebles at Providence Hospital, where Peebles was then located due to a medical issue, to discuss the January 5th interview, her conduct, and the emails. (Doc. 29-1 at 50). Following that meeting,

3

ILC management met separately, and Peebles decided that since Cherry was still in her probationary period, it would be best to sever the relationship and terminate her. (Id. at 51).

Accordingly, on January 6, 2023, ILC terminated Cherry. (Doc. 29-1 at 43 (Decltn. Carter-Pugh)). "Ms. Cherry's work product was determined to be unsatisfactory on numerous occasions; her behavior during an interview of a prospective employee was determined to be inappropriate; and her response to her supervisor's constructive criticism of her work performance was insubordinate, unprofessional, and unacceptable by ILC standards." (Id.)  Cherry was replaced by ILC's former HR Director Timothy Hicks, who is Black. (Id. at 45).

On January 7, 2023, Whittington issued a termination memorandum regarding Cherry stating that immediately after her hiring, he began receiving complaints from multiple staff members about how she spoke to them. (Doc. 29-1 at 47). Additionally, Whittington stated that on ILC's account, Cherry fraudulently represented her experience on her staff profile, stating she had 20+ years of HR experience. (Id.) Moreover, Whittington addressed staff member complaints about Cherry's behavior, CEO Peebles' displeasure about the lack of professional quality in a letter to an applicant, and the circumstances of the January 5th interview. (Id.)

On January 12, 2023, CEO Peebles issued a termination memorandum regarding Cherry addressing the same issues set forth in Whittington's memorandum, as well as the January 5th. meeting, and that Cherry had texted him stating she was taking legal action against ILC for wrongful termination. (Doc.29-1 at 50-51).

On January 25, 2023, Cherry filed charges with the EEOC.  On February 16, 2023, Cherry received a right to sue letter.

4

On April 21, 2023, Cherry initiated this litigation against ILC alleging she was terminated based on her race (race discrimination), retaliation, and hostile work environment, in violation of Title VII of the *Civil Rights Act of 1964,* 42 U.S.C. § 2000e *et seq*., seeking back pay. (Doc. 1). The entirety of Cherry's allegations are as follows: 1) she was "fired over an email regarding meeting with … Whittington plus … Peebles" based on her race; 2) she suffered retaliation based on her race; and 3) Whittington created a hostile work environment "for myself and other employees I ask for a meeting with the director and Tommy …. fired me." (Id.)

## II.     Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Rule 56(c) provides as follows:

> *(c) Procedures*
>
> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c).

The movant must demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence and the inferences from that evidence in the light most favorable to the nonmovant. Jean–Baptiste v. Gutierrez, 627 F.3d 816, 820 (11th Cir. 2010). The movant "always bears the initial responsibility of informing the district court of the basis for its motion." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. Id. Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); see also Fed. R. Civ. P. 56 Adv. Cmte. Note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials.... [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the movant meets its burden, the burden shifts to the nonmoving party to establish -- with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. Celotex, 477 U.S. at 324. A genuine dispute exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. Waddell v. Valley Forge Dental Assoc., 276 F.3d 1275, 1279 (11th Cir. 2001).

### III. <u>Conclusions of Law</u>[3]

Cherry alleges Title VII racial discrimination, retaliation, and hostile work environment. ILC moves for summary judgment on Cherry's claims for discrimination and retaliation. Specifically, ILC argues that Cherry cannot satisfy her <u>McDonnell Douglas</u> burden because: 1) she cannot identify comparators who are "similarly situated in all material respects" and were treated more favorably; 2) ILC has legitimate, nondiscriminatory reasons for her termination; and 3) she cannot establish pretext. Additionally, ILC asserts "Cherry was not terminated, or otherwise treated differently … because she is Black."  (Doc. 29-1 at 44 (Decltn. Carter-Pugh)).

### A. <u>Title VII Race Discrimination</u>

In relevant part, Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race …." As summarized in <u>Moss v. St. Vincent's Health Sys.</u>, 2024 WL 729953, *1-2 (11th Cir. 2024):

> In the absence of direct evidence of discrimination, a plaintiff may prove a discrimination claim under Title VII through circumstantial evidence, which we generally analyze using the three-step, burden-shifting framework established in *McDonnell Douglas. E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002).… Under this framework, the plaintiff must first establish a *prima facie* case of intentional discrimination. *Id.*
>
> If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1221 (11th Cir. 2019) (*en banc*). As long as the employer articulates a clear and reasonably specific non-discriminatory basis for

---

[3] Cherry is proceeding *pro se*. As the Eleventh Circuit explained in <u>Johnson v. Bottling Group, LLC</u>, 2024 WL 889260, *1 (11th Cir. Mar. 1, 2024):

> While *pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will be liberally construed, we may not "serve as *de facto* counsel for a party [or] rewrite an otherwise deficient pleading in order to sustain an action." *Campbell v. Air Jam Ltd.*, 760 F.3d 1165, 1168-69 (11th Cir. 2014). …

its actions, it has discharged its burden of production at this stage. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254-55 (1981). The burden then shifts back to the plaintiff to show that the stated reason is pretextual. *Id.* at 255-56. A plaintiff can show pretext by presenting evidence that a proffered reason is false, and that discrimination was the true reason for the adverse employment action. *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006). Employers are free to promote an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as the promotion is not based on discriminatory reasoning. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*). Provided a reason given might motivate a reasonable employer, the plaintiff must meet it head on and rebut it to prove pretext. *Id.* The employee cannot succeed by simply quarreling with the wisdom of the employer's reasoning. *Id.* When a plaintiff chooses to attack the veracity of the employer's proffered reason, the inquiry is limited to whether the employer gave an honest explanation of its behavior. *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1310-11 (11th Cir. 2012).

We have held that a plaintiff may also defeat a summary judgment motion by presenting a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination. *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019). A convincing mosaic can be shown by (1) suspicious timing, ambiguous statements, and other "bits and pieces" from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) evidence that the employer's justification is pretextual. *Id.* Thus, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case. *Id.* Speculation about the employer's actual reasoning does not create a genuine issue of fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). To succeed, the plaintiff must show that the employer's proffered explanation is unworthy of credence by revealing weaknesses, inconsistencies, or contradictions in the explanation. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

See also Sims v. MVM, Inc., 704 F.3d 1327, 1332-1333 (11th Cir. 2013) (discussing the convincing mosaic standard on summary judgment).

Cherry alleges only circumstantial evidence of Title VII race discrimination and so the McDonnell-Douglas framework applies. To support a *prima facie* case for race discrimination, Cherry must establish by a preponderance of the evidence that: 1) she is a member of a protected class; 2) she was qualified for the position; 3) she experienced an adverse employment action; and

4) she was replaced by someone outside her protected class or the employer treated similarly situated employees outside of her class more favorably. Thomas v. Ashton & Co., Inc., 2021 WL 640815, *5 (S.D. Ala. Feb. 18, 2023). Flowers v. Troup Cty., Ga., School Dist., 803 F.3d 1327, 1336 (11th Cir. 2015). Similarly situated means "similarly situated in all material respects." Lewis v. City of Union City, Ga., 918 F.3d 1213, 1218 and 1224 (11th Cir. 2019) (the "nearly-identical test is too strict").

At the outset, there is no dispute that Cherry, who is Black, is a member of a protected class and that she experienced an adverse job action when she was terminated. Even assuming *arguendo* for purposes of summary judgment that she was qualified – which ILC apparently disputes (arguing she was terminated due to poor work performance) -- Cherry has failed to show that ILC replaced her with someone outside her protected class or that ILC treated similarly situated employees outside of her class more favorably. Notably, the evidence reveals – and Cherry testified that she was aware -- that ILC replaced her with someone *within* her protected class (who is Black). (Doc. 29-1 at 27, 35 (Dep. Cherry at 80, 92); Doc. 29-1 at 43 (Decltn. Carter-Pugh)). Additionally, Cherry has offered no evidence of more favorable treatment by ILC towards similarly situated employees outside of her protected class. At most, Cherry asserts in her Response: "Staff complained about Mr. Whittington Racist acts. But there was no corporate office to complain to about this action[;]" Whittington "only targeted and talked to my race very differently than how he would talk to his race. It was always angry and aggressive with the African American but very humble with his same race[;]" Whittington "have showed so much angry against the African American staff[;]" and once the ILC board "found out what happened … Whittington was terminated[.]" (Doc. 31 at 1-3). However, Cherry fails to provide *any* details regarding the

9

foregoing vague allegations. Apart from these unilateral assertions, Cherry's Response also fails to include *any* evidence in support of these claims. This leaves the Court with Cherry's speculation and conjecture, and no other facts giving rise to a triable issue. Thus, Cherry has failed to meet her *prima facie* burden and her Title VII race discrimination claims fails.  Thomas, 2021 WL 640815 at *7 ("…*See Pace v. S. Ry. System*, 701 F.2d 1383, 1391 (11th Cir. 1983) ('[F]ailure to establish a prima facie case warrants summary judgment.').").

Nevertheless, even if Cherry had satisfied her *prima facie* burden – *which she has not* – dismissal of her claim is proper because ILC has articulated legitimate non-discriminatory reasons for her termination. These include Cherry's poor work performance; insubordinate and inappropriate comments made to Whittington on January 6th; that ILC communicated to her that it was terminating her employment as a result of her poor work performance; and termination memorandums drafted by Whittington and Peebles which set forth ILC's reasoning for her termination, none of which have any indicia of racial discrimination. Given that ILC has met its burden of articulating a legitimate non-discriminatory reason for its decision to terminate Cherry, to avoid summary judgment, she must demonstrate pretext. However, Cherry has made no effort to address these proffered reasons and/or attempt to show pretext, much less establish such.

As such, ILC's motion for summary judgment on Cherry's Title VII race discrimination claim is **GRANTED.**

B.     **Title VII Retaliation**

Title VII prohibit employers from taking adverse actions against employees in retaliation for their opposition to statutorily prohibited racial discrimination. 42 U.S.C. § 2000e–3(a). As with Title VII race discrimination, a plaintiff may establish a claim of retaliation with circumstantial

evidence, prompting the McDonnell-Douglas burden shifting framework. Moss, 2024 WL 729953 at *4. As explained in Moss, 2024 WL 729953 at *4-5:

> To establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). The standard for determining what constitutes an adverse employment action is different in retaliation claims than it is for claims of discrimination. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). A plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Id.* "Trivial harms" are not adverse employment actions. *See id.*
>
> The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated. *Pennington*, 261 F.3d at 1266. The plaintiff may prove causation by showing that the employer knew of her statutorily protected activity and there was a close temporal proximity between this awareness and the adverse employment action. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). A putative causal connection between the plaintiff's protected conduct and the materially adverse decision may be undermined by evidence of a superseding cause of the adverse decision. *See Fleming v. Boeing Co.*, 120 F.3d 242, 248 (11th Cir. 1997) (no genuine issue of material fact as to a causal connection between plaintiff's complaints of harassment and the adverse employment decision where plaintiff failed a required typing test in the interim). A decisionmaker cannot have been motivated to retaliate by something unknown to her. *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020). An argument that the decisionmaker must have known about the protected activity is too speculative because evidence that she could have known about it is not the same as evidence that she did. *Id.* at 1054.
>
> If the plaintiff has successfully made out a *prima facie* case, the burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2002). If the employer meets its burden, the presumption of retaliation disappears, and the plaintiff must then show that the reasons offered by the employer were merely a pretext for retaliation. *Id.* The plaintiff can do so by showing that it was more likely that a retaliatory reason motivated the employer or by pointing to "weaknesses, inconsistencies, incoherencies, or contradictions" in the explanation. *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010). If the proffered reason is one that would

motivate a reasonable employer, a plaintiff cannot simply quarrel with the wisdom of the employer's decision and must instead meet that reason head on and rebut it. Chapman, 229 F.3d at 1030. The plaintiff must prove "that the desire to retaliate was the but-for cause of the challenged employment action." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013).

Lacking any direct evidence, Cherry again relies on circumstantial evidence to support a Title VII retaliation claim based on race. Under the McDonnell-Douglas framework, Cherry's *prima facie* case requires that she establish that: 1) she engaged in statutorily protected activity; 2) she suffered a materially adverse employment action; and 3) there was a causal link between the protected activity and the subsequent materially adverse employment action. Brush v. Sears Hldg. Corp., 466 Fed. Appx. 781, 786 (11th Cir. 2012). While Cherry suffered a materially adverse employment action, termination, she has offered *no* evidence of any instances of statutorily protected activity much less any causal link between such activity and her termination. Notably, Cherry has made little effort to even address retaliation in her response on summary judgment, much less "identify any statutorily protected activity on her part that would give rise to a cognizable retaliation claim."[4] See, e.g., Prowell v. Alabama Dept. of Human Resources, 2022 WL 3848667, *11-12 (N.D. Ala. Sept. 5, 2012) (finding similarly). Thus, her *prima facie* case fails.

Even assuming *arguendo* that Cherry established her *prima facie* case – *which she has not* -- ILC has articulated legitimate non-discriminatory reasons for her termination (see *supra*). Reasons, which again, Cherry has wholly failed to address much less rebut directly in her response

---

4 In Cherry's complaint, she alleges that she was retaliated against for requesting a meeting about an alleged hostile work environment. In Cherry's affidavit, submitted as her response to the summary judgment motion, she alleges that her supervisor was "angry and aggressive with African Americans." She also alleges she was subject to a hostile environment because her supervisor was "following me around going against everything a I had done." Cherry alleges that the termination was in retaliation for an email. In the referenced email, Cherry advises her supervisor not to interrupt her during interviews, to change his attitude, and accused him of unprofessional conduct. There is no mention in the email of a hostile work environment based on race.

on summary judgment. See, e.g., Cunningham v. Florida Credit Union, 2017 WL 6610886, *6 (M.D. Fla. Nov. 1, 2017) (finding similarly). As such, ILC's motion for summary judgment on Cherry's Title VII retaliation claim is **GRANTED.**

### IV.    Conclusion

Accordingly, it is **ORDERED** that ILC's Motion for Summary Judgment (Docs. 28, 29), on Cherry's Title VII race discrimination and retaliation claims, is **GRANTED.**

**DONE** and **ORDERED** this the **8th** day of **March 2024.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**